Van Arsdalen *v.* Van Arsdalen.

ELIZABETH VAN ARSDALEN

*v.*

PAUL VAN ARSDALEN.

A husband excluded his wife from their bed-room, and imputed to her physical malformation and consequent incapacity for the marital relation. He removed to another house, to which he denied her admittance, on the ground of such alleged incompetency, notwithstanding her expressed willingness to return to him and do her duty. —*Held,* that she was entitled to relief on her bill for maintenance.

Bill for maintenance.    On final hearing on pleadings and proofs.

*Mr. A. V. Schenck,* for complainant.

*Mr. E. W. Strong,* for defendant.

THE CHANCELLOR.

The parties are husband and wife. They reside in Middlesex county, and were married in December, 1876. The bill states that the defendant has, without just cause, abandoned the complainant, and separated himself from her and refused to maintain and provide for her. The answer denies the abandonment, and that the defendant has refused to maintain the complainant, and states that, on the contrary, she voluntarily left him to go and live with her relations, and that he has frequently, since she left him, requested her to return, and has, ever since she left him, been desirous, as he still is, that she should come back and live with him as his wife.

It appears from the testimony that, when the marriage took place, the complainant was about thirty-five years of age, and the defendant about eighty. She was his third wife. He was divorced, on his own application, from his second wife. On the 27th of March, 1877, soon after

their marriage, the parties went to live in a house owned by the defendant, in Codwise avenue, in New Brunswick. They lived there together until the 12th of June following, when he removed to another house of his, in Hale street, in that city. His design in removing appears to have been to take his meals in the family of Charles Thompson, the husband of a granddaughter of his, who lived in another of his houses in Hale street, immediately opposite the one into which he moved, and to lodge in the latter house. He did not intend to occupy the whole of the latter house, but only two rooms—a bed-room for himself, and one for his wife. Such were the relations of him and his wife towards each other at that time, that they not only occupied separate sleeping apartments, but he refused to eat food which had been cooked by her, and habitually cooked his own victuals. About the 5th of May, while they were living in the house in Codwise avenue, he threw her clothes out of the bed-room which he and she had occupied together up to that time, and locked the door, and kept the key, so as to exclude her from the room. Soon afterwards he apologized to her for his conduct, and obtained her forgiveness. She returned to his room, but two days afterwards he again locked her out of it, and never permitted her to return to it again so long as they lived in the house, which, as before stated, was up to the 12th of June following. He forbade her to cook for him, alleging, as his reason, that he was afraid that she would poison him. He charged her with having attempted to poison him, and declared that on one occasion she put some poisonous substance, which he believed was arsenic, into his coffee, and that after drinking it he was taken sick from the effect of the poison, and saved himself from death by the use of an antidote which he had previously obtained at a drug store and kept in the house because of his apprehensions that she would attempt his life by means of poison. He said he did not want her in his room, because she was physically unfit, by reason of malformation, for connubial intercourse. He told her she was

no woman, and he, therefore, did not want her. The last week of their residence in the house in Codwise avenue, he did not provide her with necessary food, and her sister Mary supplied it. While they lived there he did not furnish her with sufficient clothing. When he had nearly finished moving his furniture to the house in Hale street, he said to her: "Now, if you are a mind to go along with me, and go peaceably, you can go." To which she replied that she would go with him.

The next day, when she was about to remove her furniture to the Hale street house, he told her she had better go and live with her father on his farm. She answered that she would go if he would support her there, and he said that he would not, that he would not support her anywhere except under his own roof. She refused to go to Thompson's for her meals, and went to her father's house, (her father then lived a short distance from the Hale street house, in the same street,) and took her meals and slept at her father's house, but spent the days at the Hale street house, where her furniture was. The defendant kept all the house locked up except the two bed-rooms. On the 20th of June her father went, with Peter Gordon, to the Hale street house, to get some furniture which was there belonging to her sister. The defendant was, when they arrived there, in the garden of Thompson's house, immediately opposite. He came over to them and said: "What are you stealing now?" They told him what their errand was. The complainant was present. Her father, at that time, said to him that he and his wife had better live together as they ought to do. She expressed her willingness to do her whole duty in every respect as a wife. The defendant asked if she would sleep with him, to which Gordon replied that she said she would do her whole duty as a wife. The defendant then said that he would not have her back; that she was not a woman. He said "it" was not a woman, and he did not want her, and he thereupon,

with utter disregard of decency, made disgusting statements in regard to her.

On that occasion, after he had refused to receive her again, she said to him, when she left him, that she was going home (to her father's house) to stay a few days, and if he would treat her well she was ready to come back to him at any time. Her father testifies that in that interview he told the defendant that now Elizabeth (the complainant) had come back to keep his house and do the best she could for him; that the defendant said he did not want her; that he then asked him why not, and he answered that she was an hermaphrodite, and said he would not have her. Her father further says that she then said to the defendant that she had now come back to do her duty as a wife ought to, if he would accept her, and that he replied that he would not. The complainant swears that on that occasion she told him she was willing to come and do her duty, her whole duty as a wife, provided he would support and clothe her, and that he said that she was no woman, and if she was not he did not want her, and that she was not.. She says that her father said to him: "You don't want her, eh?" to which he replied: "No; she is no woman, and I don't want her," and added the derogatory remarks before referred to.

It is true the defendant and Charles Thompson swear that the defendant did not refuse to take the complainant back, but said that his door was open to her at any time when she would cook for him, and that she said she would not cook for him; but the weight of testimony is with the complainant. Both Thompson and the defendant say that the latter did then allege that his wife was not a "fair woman." There is corroboration of the complainant's witnesses in the defendant's statements made to his acquaintances on the subject of his relations to his wife, and the cause of their separation. In none of them did he attribute the separation to her unwillingness to do her duty in any respect to him, but in all of them he stated that it was on account of his unwillingness to live with her because of the physical unfit-

ness before mentioned.   To Archibald M. Gordon he said, in August, 1877, (the bill was filed July 28th, 1877,) that the reason why he moved from the Codwise avenue house was to get rid of her; and when Mr. Gordon expressed a hope that they would live together again, he replied, "No, I will never have her back again."   In or about September, 1877, he told George W. Furman, an acquaintance of his, who called on him at the Hale street house on business, that his wife was not a woman, and with disgusting particularity described the physical defects which he imputed to her, and at the same time ascribed to her inordinate venereal appetite.   He then said that he would have a "bill of divorce from her in two weeks' time, anyhow, in spite of her."   To his own daughter, the complainant's step-mother, he said, that his wife was not a woman, and that he believed he could readily get a divorce from her on that account.   In September, 1877, he admitted to William Kent that he had said his wife was no woman.   In August, 1877, he said to Abraham D. Van Pelt that she was no woman, referring to and describing her alleged physical defect, and that he intended to get rid of her, and was going to New York (he was then on his way to that city) to see if his "bill of divorce" was ready.   To Mr. Van Pelt's question whether he could "get a divorce in New York that way," he replied, "Yes, I got one before."   As before stated, he was divorced from his second wife.   Though the defendant denies he stated to any one after the commencement of this suit that his wife was not a woman, the evidence against him is overwhelming.

The complainant testifies that the physical defects imputed to her have never existed, and there is no evidence to the contrary except the defendant's statement.   Though he and Thompson say that he was desirous, when she spoke of returning to him, that she should pledge herself to cook for him if he permitted her to return, it seems difficult to reconcile this with the admitted fact that he charged and believed that she twice attempted to poison him, and in consequence

of his apprehensions on that score refused to eat food prepared by her. In his cross-examination, to the question, "Do you now, on your oath, say that you suspect your wife of having administered, or having attempted to administer, or of having been concerned in any way in any attempt to administer poison to you, in any manner, at any time?" he replied, "I say more than once." And to the question, "Do you mean now to be understood as saying that you suspect your wife of having attempted to poison you by means of the coffee, to which you have referred?" he answered, "I said I expected that she meant to poison me, or that her sisters did; they are all a set of hell-hounds." It seems improbable that, with these convictions upon his mind, he would have even desired, much less have insisted, that his wife should pledge herself to cook for him.

It is claimed in his behalf, as evidence of his disposition to deal liberally in pecuniary matters with her, that he conveyed to her part of his property; but it appears that the deed was made within a few days after their marriage, and conveyed an estate for his and her joint lives, (the rents, issues and profits to be taken by him alone, however,) with remainder to the survivor. And referring to this property he said to Mr. Van Pelt, in the conversation before referred to, that it was subject to a mortgage to Mr. Ogilby, and that he could have it foreclosed by not paying the interest promptly, and could have some friend buy the property in for him; thus indicating his purpose to deprive the complainant of her interest in it.

It is very evident that the married life of these parties while they lived together in the Codwise avenue house was unhappy, by reason, it would seem, to a very great extent, of the defendant's parsimoniousness, his suspicious disposition, and his coarse, vituperative and provoking language towards his wife; while she, on the other hand, gave evidence of a high and at least somewhat resentful temper. He appears to have conceived a dislike to her three sisters, on the ground that they lived upon him; and to one person,

Van Arsdalen *v.* Van Arsdalen.

and perhaps more, he complained of it, but there seems to have been no ground for the complaint. As to two of them, they were at his house to stay only a few days at most, and were there to do the work of his household during the temporary disability of his wife. He kept no servant. As to the other, it was agreed between him and his wife that she, her youngest sister, whom her mother at her death had consigned to her especial charge, should live with them (up to the time of the marriage she had been living with the complainant), and it appears that when the defendant complained of her presence in his house she left it.

But whatever may have been the scenes and contentions and the cause of them before the defendant left the Codwise avenue house, it is proved that, on the 20th of June, 1877, the occasion before referred to, the complainant went to him and asked him to take her back into his house and support her, she then promising to do her whole duty as a wife towards him; and he then positively denied her request, and refused to receive her, alleging that, by reason of her physical defects and her consequent incapacity for matrimony, he did not want her and would not have her. From that time he must be regarded as having abandoned her and refused to provide support for her. It is true he says in his answer that he often requested her to return, and in his testimony he says he told her solicitor that he was desirous that she should return to him; but it does not appear that he ever told her so or sent her even any invitatory message, although she was living within a few doors from him, and in the family of his own daughter. On the contrary, it appears that in September, 1877, two months after this suit was brought, he of his own accord sent part of her clothes from the Hale street house to her at his daughter's house, and soon after, without any request from her, took all the rest there himself.

The complainant is entitled to the relief which she seeks.